RECORD NO. 10-1433

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT
_____

R. J. INVESTMENTS, LLC

*Plaintiff-Appellant,*

v.

THE BOARD OF COUNTY COMMISSIONERS FOR QUEEN ANNE'S COUNTY, MARYLAND, et al.

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION
_____

**REPLY BRIEF OF APPELLANT**
_____

James J. Doyle, III
Warren K. Rich
Anthony G. Gorski
Rich and Henderson, P.C.
51 Franklin Street, Suite 300
Annapolis, MD  21401
410-267-5900
jdoyle@richlaw.com
wrich@richlaw.com
agorski@richlaw.com

*Counsel for Appellant*

# **TABLE OF CONTENTS**

TABLE OF CASES, STATUTES AND AUTHORITIES ...............................ii

STATEMENT OF THE ISSUES ....................................................1

I.    Appellees have mischaracterized the testimony of Doctor Knapp, the only expert in this case, who testified concerning the disparate impact on minorities caused by the denial by the Appellees for water and sewer designation for the proposed project.

II.   Appellant Properly preserved its Objection to Scanlon's Expert Testimony.

INTRODUCTION ...............................................................1

SUMMARY OF ARGUMENT ........................................................2

I.    Appellees have mischaracterized the testimony of Doctor Knapp, the only expert in this case, who testified concerning the disparate impact on minorities caused by the denial by the Appellees for water and sewer designation for the proposed project............................................7

II.   Appellant Properly preserved its Objection to Scanlon's Expert Testimony ...............................................................16

CONCLUSION ................................................................18

CERTIFICATE OF COMPLIANCE.................................................20

CERTIFICATE OF SERVICE ..................................................21

# TABLE OF AUTHORITIES

## CASES

*Batson v. Kentucky,* 476 U.S. 79 (1986)............................................................3

*Betsey v. Turtle Creek Associates*, 736 F.2d 983 (4th Cir. 1984)......................3, 4

*Rice v. Community Health Association,* 203 F.3d. 283, 287(2000) .................17

*Smith v. Town of Clarkton, N.C*., 682 F. 2d 1055, 1065 (4th Cir. 1982)............3, 4

*Washington v. Davis*, 426 U.S. 229 (1976) .......................................................3

*U.S. V. Swaim,* 642 F.2d 726, 730 (1981) .......................................................17

## STATUTES

Fed. R. Evid. 103(a) .......................................................................................16

Fed. R. Evid. 701 ...........................................................................................18

Fed. R. Evid. 701(c) .......................................................................................17

Fed. R. Evid. 702 ...........................................................................................17

## STATEMENT OF THE ISSUES

I.  Appellees have mischaracterized the testimony of Doctor Knapp, the only expert in this case, who testified concerning the disparate impact on minorities caused by the denial by the Appellees for water and sewer designation for the proposed project.

II.  Appellant Properly preserved its Objection to Scanlon's Expert Testimony.

## INTRODUCTION

Appellees spend forty-four (44) pages summarizing the record, yet devote just twelve (12) pages to legal argument.  *See*, Appellees' Brief.  The result is that this case appears mind numbing and complex.  It is not.

This case is about an application for a property designation in a county water and sewer plan that would give the property owner the right to come back and ask for water and sewer allocation months or years later. The baseless denial of that application by Appellees caused a disparate impact upon the housing availability for the minority community a violation of the Fair Housing Act.

The discussion of the new wastewater treatment plant's operational status is irrelevant.  The Appellees' discussion of over allocations and over loading the new wastewater treatment plant is also irrelevant as Appellant

did not ask for water or sewer allocations (the need for immediate services) it asked for a change in the property's designation (the estimated date of future service) in the County Water and Sewer Plan. The lengthy discussion of the Queen Anne's County Moderately Priced Dwelling Unit program is also not relevant. The program is dysfunctional – a proverbial white elephant that has accomplished nothing since its inception. Finally, the repeated references to current economic conditions and the housing market fluctuations in years <u>after</u> the offending decision are also irrelevant. The issue is not what happened after the Appellees' decision, it is whether their decision violated the Fair Housing Act.

## <u>SUMMARY OF ARGUMENT</u>

As discussed in Appellants' Brief in more detail, in order to determine whether a violation has occurred, the Court must consider:

(1)    how strong is the plaintiffs showing of discriminatory effect;

(2)    is there some evidence of discriminatory intent;

(3)    what is the defendant's interest in taking the action complained of; and

(4)    does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Smith v. Town of Clarkton, N.C.*, 682 F. 2d 1055, 1065 (4th Cir. 1982).

The first and most critical factor to be considered in a FHA case is how strong a showing can be made regarding discriminatory impact. *Id*. The second *Clarkton* factor is the presence or absence of discriminatory intent. Notably, the evidence of discriminatory intent can be more attenuated than that required by *Washington v. Davis*, 426 U.S. 229 (1976), pertaining to the degree of racial intent needed to prevail on a Fourteenth Amendment Equal Protection claim. In addition, a demonstration of disparate impact under factor one is circumstantial evidence of a discriminatory *mens rea*. *Batson v. Kentucky*, 479 U.S. 79 (1986).

As for the Defendants' motivation in taking the complained-of action, there was no rational basis for denial of the water and sewer category change, particularly considering that the Appellee did not seek actual sewer service and that the new waste water treatment plant discussed by Appellees had been approved, financed, and largely constructed at the time of the denial of the upgrade. The final *Clarkton* factor is whether the Plaintiffs "seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." *Clarkton* at 1065. In the instant matter, Plaintiffs complain of Defendants' interference

3

with their ability to provide affordable  and MPDU units to members of the African American community.   As indicated by the Fourth Circuit in *Clarkton* and *Betsey*, a local government's interference with this process, to the extent that it results in a disproportionate effect upon minority homeownership or perpetuated existing disproportionate effects, neither the FHA nor controlling case law precludes a plaintiff from bringing suit for the denial of the opportunity to construct affordable housing.  *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Betsey v. Turtle Creek Associates*, 736 F.2d 983 (4th Cir. 1984).

Only one expert testified in this case, Dr. Gerrit Knapp who testified quite clearly that the Appellees' action had a substantial disparate impact on potential minority home buyers.  Apx. 175-183, 190-191, 1450-1451, 1479-1480.  Disparate impact is based upon a statistical analysis that only Dr. Knapp performed.  It consists of several different types of analysis, each involving different geographical levels and each indicated quite strongly that the Appellees actions caused a disparate impact.  *Id*.  While the Appellees attempt to point out what they allege are flaws in this analysis, the fact is that the statistical analysis shows disparate impact and no expert witness contradicted that.

First, the Appellees contention, in their Response Brief, that there was no need for affordable housing in the county at the time of the disputed decision is contradicted by the overwhelming evidence in the case. The County's own report, the "Berger Report," concluded that there was a need for affordable housing in Queen Anne's County. In addition, Dr. Knapp himself reviewed the affordable housing options that were available in Queen Anne's County at the time of the Commissioners' decision, and found that the only affordable housing options were rental units (in most cases senior-only housing), and nearly every option had a substantial waiting list of applicants. Finally, Appellees admitted at the May 2007 meeting in which the project was denied, that one of the supposed reasons for denial was that a ten percent (10%) set-aside for affordable housing was not enough. Apx. 459, line 18, 460, line 4. Appellees were well aware of the need for affordable housing in Queen Anne's County at the time of their decision, as they are now.

Second, as Dr. Knapp testified at trial, and as his reports demonstrate in detail, the Commissioners' decision definitely resulted in adverse impact on minorities. Apx. 188-190. Even without consideration of the proposed donation parcel, Dr. Knapp's unrebutted trial testimony concluded that minorities suffered a disparate impact because of Appellees' actions. *Id*.

Third, the Appellees contentions regarding the alleged failure of Dr. Knapp to account for the "real estate bubble that had been developing, and business cycles" is really totally irrelevant to this case. The Commissioners' decision was made in 2007; the real estate market was not an issue at the time of the Commissioners' decision; thus they are completely irrelevant and simply an attempt to divert the court from the real evidence that was presented in this case.

In addition to the errors made by the District Court in discounting the testimony of Dr. Knapp, the court also erred in permitting Mr. Scanlon to testify and attempt to contradict the conclusions and undermine the analysis made by Dr. Knapp. Mr. Scanlon was not designated as an expert, has no expert credentials, and admitted he did not know how to conduct the requisite analysis. A review of the testimony relied on by the Appellees clearly establishes that Mr. Scanlon was permitted over the objection of Appellant, Dr. Knapp's analysis. The Court allowed and relied upon his testimony in error.

Finally, the District Court erred in completely ignoring, or perhaps misunderstanding, the difference between a water and sewer designation, and a water and sewer allocation. The District Court erred in determining that it was a legitimate interest for the Appellees to reject the project because

a new wastewater plant had not become operational at the time of the vote on the Application.  The operation of the new plant was not an issue because, as was clearly pointed out in testimony before the court, there is a clear distinction between an application for water and sewer <u>designation</u>, and an actual capacity <u>allocation</u>.

The Appellants were in the Queen Anne's County Water and Sewer Plan and had only applied for a change in designation, which in no way depended on the new plant being operational at the time of the vote.[1] Unfortunately, the court simply failed to recognize any distinction between a property's designation (the estimated date of future service) and an allocation (the need for immediate services).   The County Planning Commission had completed its review and had recommended approval of the <u>designation</u> Appellant requested, documenting that the Application had met every County requirement.   Since the final approvals needed for <u>allocation</u> and build out would have taken a year or more, there was absolutely no reason to deny a designation because the expanded plant was not operational at that time.  Apx. 236-238.

I.     Appellees have mischaracterized the testimony of Doctor Knapp, the only expert in this case, who testified conclusively that the denial of the water and sewer designation for the proposed project caused <u>disparate impact on minorities.</u>

---

[1] In fact, the plant actually did become operational within a week of the vote.

Appellees attempted to discredit Dr. Knapp, while at the same time failing to produce any expert opinion that contradicts his findings. Failing miserably to do so, Appellees lob numerous incorrect or misleading statements concerning Dr. Knapp's testimony, in hopes of giving the appearance that he is discredited despite the lack of any contradictory expert opinion or evidence.

Astoundingly, Appellees Brief abandons their own testimony and documents to dispute the need for affordable housing[2] in Queen Anne's County at the time of the denial. Appellee's Brief at 50. That simply contradicts all of the evidence in this case. Dr. Knapp comprehensively designated the need for affordable housing in his supplemental report of October 28, 2008. *See* Apx. 1444-1452. Dr. Knapp concluded that the lower cost MPDU homes would be much more prevalent in the proposed project than they are in the County at large. *Id.* The numbers show an unmet need for homes in the MPDU price range. *Id.* County level analysis demonstrated that 30.6% of all families in the County would qualify for an MPDU. Despite that, only 3.9% of the County's homes are valued in the

---

[2] Queen Anne's County has an affordable housing program established to require Moderately Priced Dwelling Units ("MPDUs"). However in five years of operation, no MPDU has been built and only one person has been qualified to participate. Apx. 636, lines 10-24.

same price range as the County's MPDUs.  Apx. 1444.  In the census tract area of the Sayers Choice project, only 6.5% of the homes are in the MPDU price range.  *Id*.

Dr. Knapp also pointed to the thorough analysis and proof of the need for affordable housing contained in the Berger Group Report in 2006.  Apx. 165-166.  The Berger Report concluded that the largest number of households experiencing a cost burden in the County came from the lowest income brackets.  *Id*.  The Berger Report further concluded that, based on the census household projections, and income trends, the lack of appropriate affordable housing stock in Queen Anne's County will only get worse.  Apx. 1444-1445.  The 2006 Berger Report was commissioned by Queen Anne's County.  *Id*.  This lays bare the Appellees' current claim that there is no need for affordable housing, as pure fantasy made up as a litigation strategy.

Dr. Knapp further found that the 17 MPDUs planned for the project would be affordable to any household earning 46.9% or more of the PMSA median income, an income range currently lacking affordable housing across the County.  Apx. 1446.

Dr. Knapp concluded that evidence of the need for more affordable housing, particularly for lower income households, was prevalent throughout the Berger Report.  Apx. 1447.  In addition, a 2003 report to the Queen

Anne's County Commissioners by the County's Affordable Housing Committee is referenced in the Berger Report as having indicated that there are "significant shortages of affordable housing in Queen Anne's County and that the trend is worsening. Apx. 1447. Finally, Dr. Knapp reviewed the existing affordable housing in the County at that time, and found that all existing affordable housing communities in the County were rental communities, that many were specifically designated for seniors age 62 or older, and that at least 9 of the eleven existing communities had applicant wait lists with estimated waits of six months to three years. Apx. 168, 1447-1450. Dr. Knapp found that it was particularly striking that approximately 60% of the families on Section 8 (federally subsidized housing) wait lists in Queen Anne's County were minorities, despite the fact that minority households only made up 10.6% of all households in the County in 2000. Apx. 1447-1450.

When the project in this case was turned down by the Commissioners, Commissioner Ransom expressly stated that he did not believe that a 10% set aside for the project for affordable housing in this case was sufficient, and that he believed that the developers should do better than 10%, even though the law only requires that amount. Why Commissioner Ransom would make such a statement in turning down the Appellants if now

Appellees' claim affordable housing was not in fact needed in the County at that time is incomprehensible.

In their second attack on Dr. Knapp's analysis, again without reliance on any expert testimony, Appellees claim that Dr. Knapp has failed to show any disparate impact on minorities. In this claim, Appellees claim that "all of Dr. Knapp's calculations in his Reports were improperly based upon inclusion of the donation parcel workforce housing" as part of the water and sewer amendment application. *See* Appellee's Brief at p. 11-12. This assertion is simply a fabrication. While some parts of Dr. Knapp's two reports dealt with the donation parcel, the majority of his work dealt simply with the impact of the 17 MPDUs that were a part of the project before the Commissioners. Apx. 183-189.

For example, in his conclusion in the supplemental report, Dr. Knapp states that while white households make up the largest share of Queen Anne's County households in the lowest income groups, the percentage of minorities in the lower incomes is far greater than in those higher income groups that could afford market rate housing. Apx. 1450-1451. He continues, that the Commissioner's decision, which prevented the Sayre's Choice project from moving forward, had a disparate impact on minorities because the price points of the MPDUs in the project correspond to higher

rates of minorities than do the market rate homes in Queen Anne's County, and because there is a lack of housing available to lower income households, among which there are also higher rates of minorities.  Apx. 1451.

In his original analysis of November 20, 2007, Dr. Knapp described the different methods of analysis that he used.  Apx. 1456-1473.  In his relative impact analysis, Dr. Knapp calculated the probability a household would qualify for a MPDU dwelling unit in Queen Anne's County, and compared the likelihood a minority family would qualify for such a unit to the likelihood that a white family would qualify.  *Id.*  As Dr. Knapp found, "in every case, the probability of qualifying for an MPDU is greater for minority families or households than for white families or households.  In almost every case, the probability that a minority family qualifies for a Queen Anne's County MPDU is generally double the probability that a white family qualifies."  Apx. 1473.  Dr. Knapp found an eligibility impact ratio at the census tract level of 2.16, at the Queen Anne's County level of 2.04, at the PUMA (for County) level of 1.68, at the PUMA level with rent restriction, at 3.32, and at the Baltimore PMSA of 2.06.  Thus, at every population level, a minority family was more likely to be eligible for an MPDU in Queen Anne's County than a white household.  Apx. 1467-1473.

There was also a disparate impact on the racial disparity ratio analysis. This ratio is calculated by comparing the proportional impact on minorities affected by the elimination of housing in a particular price range to the corresponding proportional impact on whites. Apx. 188-190. Dr. Knapp calculated this analysis with respect to all levels of housing that were to be initially included in the Sayre's Choice Development, but also specifically as to the MPDU townhouses. With respect to simply MPDU townhouses, Dr. Knapp found, at the census tract level, a racial disparity ratio of 1.23, while at the Queen Anne's County level, a ratio of 6.47, and at the Baltimore PMSA level, a ratio of 4.19. Ratios above 1.0 reflect a disparate impact. *Id*. These calculations show significant disparate impact on minorities as a result of the denial of the water and sewer designation amendment. *Id*. Dr. Knapp responded directly to the allegation with respect to the donation parcel. At trial, Dr. Knapp was asked if his opinion changed if the 50 units were not included as part of his analysis. *Id*. He stated unequivocally that the numbers he computed with respect to MPDUs did not change. *Id*. In addition, as to his overall conclusion, based on all the analysis that he had done, his answer was that the overall conclusion did not change. There was a disparate impact. *Id*.

Appellees also throw out other charges or allegations, but their relevance is unknown, and simply not supported or backed up by any expert testimony. For example, Appellees contend that Dr. Knapp relied upon figures from the 2000 census. They contend that the use of income and home prices thus were significantly out of date. But, of course, in 2005- and 2002 when the work was done, that was the last census available, and housing prices for the analysis were then adjusted to that point, by using housing price indices which is standard practice in housing market analysis. Apx. 176.[3]

The fact that the Appellees state that Dr. Knapp did not perform calculations or update calculations beyond 2005 is not significant. In this case, the Commissioners actions in denying the housing occurred in May of 2007. The Appellees' claim that the current economic changes in lending practices and the so-called "housing bubble" which have occurred since that time are simply not relevant and not contradictory of the analysis that Dr. Knapp performed. In addition, there is no explanation as to what impacts, if any, the reported changes in the housing market would mean to Dr. Knapp's analysis, if anything. The effects of such factors are totally unexplained. Again, because the Appellees chose not to produce any expert testimony, or

---

[3] Mr. Scanlon admitted on cross examination that he had no idea how the price indices were used on these calculations. Apx. 641, lines 2-18.

to produce any expert opinion that would contradict or take into account the so-called changes in the housing market and the housing bubble, there is simply no way for the court to evaluate what impact, if any, those claims have on Dr. Knapp's analysis. As a result, there simply is nothing to support the Appellees contention that the analysis by Dr. Knapp was "significantly out of date."

Appellees further contend that Dr. Knapp agreed that both non-minorities and minorities were denied an opportunity to live in Sayre's Choice. That fact is irrelevant. Dr. Knapp's conclusion, again unrebutted by any expert, is that there was a significant disparate impact on minorities because of the actions of the Appellees in this case. There are numerous other assertions that are made by the Appellees with respect to Dr. Knapp's analysis. However, there is no explanation as to how any of these other non-expert criticisms contradict the conclusions of Dr. Knapp.

For these reasons, the District Court erred in concluding that Dr. Knapp's testimony was not credible. Dr. Knapp's testimony established a need for affordable housing, particularly among lower income groups of which minorities made up a significant proportion, and it established that the elimination of this project had a disparate impact on minorities. His unrebutted testimony should not have been rejected by the District Court.

This error prejudiced the Plaintiff at trial and the District Court decision should be reversed and remanded.

II.   **Appellant Properly preserved its Objection to Scanlon's Expert Testimony.**

The fact that Appellee/Defendant had made no expert disclosure and was to proffer no expert testimony was clear to the parties and Judge Bennett.  Apx. 129, lines 16 through page 130, line 2.  This case involved extensive pretrial motions during which the Defendants failure to provide expert witness disclosures and election to continue without an expert was very much at the forefront with the trial court.  Federal Rules of Evidence Section 103 requires that, to pursue an issue for appeal, an objection be made when the evidence, in this case testimony, is offered.  Fed. R. Evid. 103(a).  Appellant did exactly that.  Apx. 626.

At that time it was clear that Appellee planned to elicit undisclosed expert testimony from its fact witness, Plaintiff timely objected.  *Id*.  The clear ruling from the Court was that the testimony of Mr. Scanlon was not expert testimony.  Apx. 626.  The Court was clear that it would allow this type of testimony over objection.  *Id*.  This is the first aspect of the error raised on appeal.

A review of the transcript shows clearly that Appellee then proceeded to elicit testimony, under the guise of factual errors or misapplication,

challenging the opinion of Appellants' expert witnesses. Apx. 626-630. The entire testimony of Mr. Scanlon challenged Dr. Knapp's expert report and opinions. Appellee had repeatedly acknowledged to the Court that it would not be calling an expert witness and made no disclosure of any expert witness testimony.

Appellees argument that Appellant did not preserve this issue via objection is misplaced. The Court understood Appellants' objection and made its ruling emphatically at trial. Appellants' timely objection preserved the issue. *Rice v. Community Health Association*, 203 F.3d 283, 287 (2000), *U.S. v. Swaim*, 642 F.2d 726, 730 (1981).

Lay witness testimony that relies upon scientific, technical or specialized knowledge is not permitted. Fed. R. Evid. 701(c). Such evidence need be presented by expert witnesses in accordance with Fed. R. Evid. 702. *Id.* Fed. R. Evid. 702. The trial court erred on allowing the Appellee to elicit such technical testimony from Mr. Scanlon over Appellants' timely objection.

The Court's error is exacerbated by the fact that Defendant/Appellant made no disclosure of such expert testimony or opinions in its discovery disclosures as required. Appellee's assertion that Appellant was surprised at Mr. Scanlon's testimony because it had not done discovery has no merit.

17

Appellee's Brief at 47.    Appellee misunderstands the argument.    The surprise was that Appellee was offering expert testimony and opinions at all.

The Court compounds the error further by allowing and relying upon the expert testimony because by doing so it prejudices Plaintiff/Appellant because without disclosure there was no notice of the need to take expert depositions.  In addition, Mr. Scanlon's cross examination testimony clearly demonstrates that he had no idea how to perform the technical analyses that form the basis of Dr. Knapp's opinion.  Apx. 641.  In addition, Mr. Scanlon had difficulty understanding the technical aspects of the reports.  Apx. 638-640.  Despite this, Mr. Scanlon challenged Dr. Knapp's methodology.  Apx. 640-641.    This goes far beyond the type of lay witness testimony contemplated by the rules.  Accordingly, the trial court erred in allowing Defendant to introduce Mr. Scanlon's critiques and opinions regarding Plaintiff's expert reports and as to matter far beyond allowed under Fed. R. Evid. 701.

## **CONCLUSION**

Based upon the foregoing, the trial court decision should be reversed and the matter remanded.

_____/S/_____

James J. Doyle, III
Warren K. Rich
Anthony G. Gorski
Rich and Henderson, P.C.
51 Franklin Street, Suite 300
Annapolis, MD  21401
410-267-5900
jdoyle@richlaw.com
wrich@richlaw.com
agorski@richlaw.com

*Counsel for Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

No. 10-1433          **Caption:** R.J. Investments, LLC v. The Board of Co. Comm. for Queen Anne's County, Maryland, et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

☑    this brief contains 3,931 [*state the number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains _____ [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

☐    this brief has been prepared in a proportionally spaced typeface using _____ _____ [*state name and version of word processing program*] in _____ _____ [*state font size and name of the type style*]; *or*

☐    this brief has been prepared in a monospaced typeface using _____ _____ [*state name and version of word processing program*] with _____ _____ [*state number of characters per inch and name of type style*].

(s) Anthony G. Gorski /s/

Attorney for R.J. Investments, LLC

Dated: 09/17/10

<u>Filing and Mailing Certificate</u>

I HEREBY CERTIFY that on this 17th day of September, 2010, I filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit the required copies of this Reply Brief of Appellant and further that same were mailed to opposing counsel at:

Richard T. Colaresi, Esquire
Victoria J. Shearer, Esquire
Karpinski, Colaresi & Karp, P.A.
120 East Baltimore Street, Suite 1850
Baltimore, Maryland  21202
410-727-5000

_____/S/_____
Anthony G. Gorski